UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEATIG INC., | Civil Action No. 1:24-cv-07946 (JPO) |
| Plaintiff, | |
| -against- | |
| BIZLOG, LLC, TRIPLOG INC., AND ADVANCE DRIVER TECHNOLOGIES, LLC, | |
| Defendants. | |

**<u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>**

**POLLACK LAW, P.C.**
225 Broadway, Suite 850
New York, New York 10007
Phone: (212) 765-5225
Fax: (929) 529-8562
Steve@stevepollacklaw.com

*Attorneys for:*
*Defendants Bizlog LLC, Triplog Inc., and*
*Advance Driver Technologies, LLC*

## <u>TABLE OF CONTENTS</u>

**BACKGROUND** ................................................................................................ **3**

**ARGUMENT** .................................................................................................... **5**

    I.    THE COURT LACKS SUBJECT MATTER JURISDICTION .................................... 5

    II.   THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS .......... 7

      (A)  Standard Under FRCP 12(b)(2) ................................................................. 7

      (B)  The Court Lacks Personal Jurisdiction Over Defendants ......................... 7

    III.  THE SAC FAILS TO STATE A CAUSE OF ACTION ............................................ 10

      (A)  Plaintiff's Breach Claims Fail in Whole or in Part ................................... 10

      (B)  The SAC Fails to Establish Legality ....................................................... 21

**CONCLUSION** ............................................................................................... **22**

Defendants BizLog LLC ("**BizLog**"), Triplog Inc. ("**Triplog**"), and Advance Driver Technologies, LLC ("**Advance**") (collectively, "**Defendants**") submit this memorandum of law in support of their Motion to Dismiss the Second Amended Complaint (ECF 29) (the "**SAC**") filed by Plaintiff Seatig Inc. ("**Seatig**" or **"Plaintiff"**) pursuant to Rules 12(b)(1)-(2) and (6) of the Federal Rules of Civil Procedure ("**FRCP**") for lack of subject matter and personal jurisdiction, and for failure to state a claim.

## BACKGROUND

After being outed for operating an unauthorized labor outsourcing scheme, Plaintiff Seatig has reworked its theory of the case and reframed the parties' relationship in the SAC. Under Plaintiff's new narrative and new claims, Seatig is a technology development company (not a labor outsourcer) that developed Defendants' technology products. (*See, e.g.*, SAC, ¶¶16-17, 20.) But this new narrative is simply false; it contradicts not only the First Amended Complaint but the contract that Plaintiff is suing upon (titled "Outsourcing Services Master Agreement"). Plaintiff's about-face to save face need not –and should not – be accepted as true. *See Trustpilot Damages LLC v. Trustpilot, Inc.*, No. 21-cv-432 (JSR), 2021 U.S. Dist. LEXIS 121150, 2021 WL 2667029, at \*9 (S.D.N.Y. June 29, 2021); *Dozier v. Deutsche Bank Trust Co. Americas*, No. 09-CV-9865, 2011 U.S. Dist. LEXIS 100467, 2011 WL 4058100, at \*2 (S.D.N.Y. Sept. 1, 2011) (citing *Colliton v. Cravath, Swaine & Moore LLP*, No. 08-CV-400, 2008 U.S. Dist. LEXIS 74388, 2008 WL 4386764, at \*6 (S.D.N.Y. Sept. 24, 2008) ("Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint a court is authorized to accept the facts described in the original complaint as true." (alterations in original)), *aff'd*, 356 F. App'x 535 (2d. Cir. 2009)).

In truth, Plaintiff Seatig offers outsourcing services to U.S. clientele wishing to employ low-cost labor in China.[1] (*See* ECF 11, ¶¶10, 23, 37; He Decl., ¶¶4, 19; He Decl., Ex. A at ¶1 (requiring Seatig to "hire and manage" certain workers selected by BizLog).) Seatig's Chinese

---

[1] Defendants deny the allegations asserted in the SAC and the FAC but treats all well-pleaded, uncontradicted allegations as true for purposes of this motion.

subsidiary, Seatig Chengdu CO. LTD. ("Seatig China"), finds and employs the workers in China and Plaintiff Seatig farms them out to U.S. businesses, including to BizLog in Washington. (ECF 11, ¶¶10, 22-23, 37; He Decl., ¶4.) All work is performed in China. (He Decl., ¶9.) Seatig's role in the relationship is quite limited. It finds suitable workers and "manage[s] time sheet, legal aspects, and security" for the workers. (*See* He Decl., Ex. A at ¶2.) It is responsible for all wage, tax, and Chinese labor law obligations. (*Id.*, ¶¶2, 8.) In contrast, the U.S. hiring party trains the worker, provides assignments, and is "responsible to make project management policies such as schedules for conference calls, frequencies for synchronizations, design & coding standards, and the policies regarding the usage of project management tools." (*Id.*, ¶3.) All know-how, intellectual property, and work product belongs to the hiring party.[2] (*Id.*, ¶¶6, 10, 12.) It is the hiring party that builds the relationship with the workers and provides them with experience. Although the SAC now claims that Seatig has some extensive onboarding processes and employee training programs (SAC, ¶¶40-41), the contract at issue makes clear that the laborers are interchangeable. (He Decl., Ex. A at ¶¶4-5.) Given its limited role, Seatig has no U.S. operations; its only registered "office" is its sole officer's house in Briarcliffe Manor, Westchester. (Pollack Decl., ¶¶2-6.)

The SAC contends that BizLog signed contracts with Seatig in 2012[3] and 2015. (SAC, ¶¶20, 22-23.) In August 2023, BizLog terminated the parties' contract. (SAC, ¶62.) Thereafter, several employees left Seatig China. (ECF 11, ¶21.) The crux of this case appears to be Seatig's belief that after termination, BizLog hired three of Seatig's workers directly. (SAC, ¶80.) This, according to Seatig, violated the non-solicitation provision in the parties' contract. (*Id.*, ¶72.) The broad provision prohibited BizLog and any entity "affiliated" with BizLog from working, regardless of the nature of the work, with anyone who ever had any relationship with Seatig or Seatig's group members for a 20-year period ***after*** that individual "worked on projects for [BizLog]." (SAC, ¶26.)

---

[2] Notably, paragraph 12 of the subject contract and a non-disclosure agreement governed by Virginia law that Seatig signed, acknowledged that Seatig was required to protect BizLog's confidential information, not the other way around. (*See* He Decl., Ex. A at ¶¶6,10,12, Ex. B.)
[3] The contract shows it was entered into in 2013, not 2012. (He Decl., Ex. F.)

On these allegations, the SAC asserts two claims, (1) breach of contract against all defendants, and (2) breach of the implied covenant of good faith and fair dealing under some implied in fact contract against TripLog and Advance. It demands a whopping sum of $4,000,000. No information is provided as to how Plaintiff arrived at that astronomical number.

<u>**ARGUMENT**</u>

## I.    <u>THE COURT LACKS SUBJECT MATTER JURISDICTION</u>

Subject matter jurisdiction is a threshold requirement that cannot be waived. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). "[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Id*. In this case, "Plaintiff invokes this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332." (ECF 7; SAC, ¶8.) But the amount in controversy does not exceed the $75,000 minimum required to invoke diversity jurisdiction. 28 U.S.C. § 1332(a). Although the SAC baldly concludes that the value underlying claims (sic) "could exceed $75,000," it alleges no facts to support such a contention. In a conclusory allegation, without any specificity, the SAC claims "one year of Plaintiff's profits over the employees that were hired by Defendants already exceeds that amount." (*Id*.) On its face, the allegation is insufficient, and substantively the allegation is untrue. (He Decl., ¶¶11-15.) New York federal courts have held "[t]he amount in controversy must be non-speculative to satisfy the statute, and conclusory allegations that the amount-in-controversy requirement is satisfied are insufficient." *Trisvan v. Regal Entm't Grp.*, No. 21-CV-187 (MKB), 2021 U.S. Dist. LEXIS 138840, 2021 WL 3145932, at *14 (E.D.N.Y. July 26, 2021); *see also Simpri v. Remillard*, No. 22-CV-03531 (PMH), 2022 U.S. Dist. LEXIS 80330, 2022 WL 1315615, at *5-6 (S.D.N.Y. May 3, 2022); *Lo v. AT&T Servs.*, No. 3:17-CV-00401 (JCH), 2018 U.S. Dist. LEXIS 13469, 2018 WL 587322, at *10 (D. Conn. Jan. 29, 2018) (listing cases and ruling insufficient "boilerplate statement that the amount in controversy exceeds $75,000.").

Plaintiff makes no attempt to support its boilerplate conclusion that "the matter in controversy exceeds $75,000." (SAC, ¶8.) Plaintiff baselessly insinuates that payment for assistance from three foreign workers between August 2023 and the present total over $4,000,000.

(SAC, ¶81.) However, the allegation is unsupported and plainly absurd. As a conclusory statement, it does not provide any factual backing for the boilerplate allegations. Plaintiff clearly relies on speculative and hypothetical calculations of damages that are not recoverable in this case—such as assuming unconditional 20-year commitments by the workers and BizLog to Seatig. But there are no allegations that either the workers or any of Defendants were ***required*** to work with Plaintiff for any period of time. Indeed, the Statement of Work for each worker concluded, making the Seatig-BizLog agreement terminable at will under Section 9 of the parties' agreement. (*See* He Decl., Ex. A at ¶9.) Consequently, even if the non-solicitation provision were enforceable and breached—which it is not—Plaintiff cannot demonstrate non-speculative damages resulting from such breach. Accordingly, because "[t]he amount in controversy must be non-speculative to satisfy the statute" and here, the claimed damages are entirely speculative, Plaintiff cannot meet the amount in controversy requirement.

Finally, even if Plaintiff could assert a claim against BizLog for $75,000 based on its "one year of Profit" theory (SAC, ¶8), it cannot then use that same $75,000 to justify jurisdiction against the other defendants, against whom there are no claims meeting the jurisdictional threshold. It is well established that for diversity actions, Plaintiff's claims against "each and every severally liable defendant must, in the normal course of things, meet the amount in controversy." *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 933 (2d Cir. 1998); *see Brookins v. Figuccio*, No. 23-CV-4429 (GRB)(ST), 2023 U.S. Dist. LEXIS 178086, 2023 WL 6442940, at *5 (E.D.N.Y. Sep. 29, 2023). Indeed, 28 U.S.C. §1367 states that in diversity cases, "the district courts shall not have supplemental jurisdiction . . . over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure." 28 U.S.C. §1367. Congress enacted this limitation to the court's jurisdiction because it "did not want parties to 'wreak havoc in diversity of citizenship cases' by 'overrid[ing] the two statutory limitations' on diversity jurisdiction: the amount-in-controversy and complete diversity requirements." *F5 Capital v. Pappas*, 856 F.3d 61, 78 (2d Cir. 2017). Here, TripLog and Advance are parties joined under Rule 20(a)(2)(A) and thus, Plaintiff must establish that it ***independently*** meets the amount-in-

controversy requirement with respect to ***each*** defendant. It has not done so, nor can it. Thus, the Court lacks diversity jurisdiction over this matter.

## II.     THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS

### (A) Standard Under FRCP 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction brought pursuant to FRCP 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Anchor v. Novartis Grimsby, Ltd.*, 282 F. App'x 872, 874 (2d Cir. 2008). "Courts may rely on additional materials outside the pleading when ruling on a 12(b)(2) motion." *Godoy v. BMW of N. Am., LLC*, No. 16-CV-5502(DRH)(SIL), 2018 U.S. Dist. LEXIS 164195, 2018 WL 4608200, at *7 (E.D.N.Y. Sep. 25, 2018). "The Court will not draw argumentative inferences in the plaintiff's favor, but will construe jurisdictional allegations liberally and take as true uncontroverted factual allegations. Conclusory allegations are not enough to establish personal jurisdiction." *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003).

"In assessing whether personal jurisdiction is authorized, the court must look first to the long-arm statute of the forum state, in this instance New York. If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).

### (B) The Court Lacks Personal Jurisdiction Over Defendants

Plaintiff puts all its eggs in the "consent" basket. (*See* SAC, ¶¶10-11.) This is Plaintiff's only option because the Court lacks general and specific jurisdiction over Defendants. No Defendant is incorporated or headquartered in New York (SAC, ¶¶5-7), *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020), and the claims do not arise out of Defendants' contacts with New York. Neither TripLog nor Advance contracted with Plaintiff, stepped foot in New York, employed workers in New York, or has operations in New York. (*See* He Decl., ¶¶7-8.) Neither company has computers, phones, faxes, or other devices in New York either. (*Id*.) And the SAC is devoid of any allegation that would connect any Defendant to New York. Similarly,

the workers at issue were employed in China by Plaintiff's Chinese subsidiary under Chinese law. (He Decl., ¶9.) The only connection this case has to New York is that Seatig's CEO owns a house in New York. (*See* Pollack Decl., ¶¶2-6.) The focus of the jurisdictional inquiry, however, is on defendants' contacts with the ***forum***, not with the plaintiff who may fortuitously reside in the forum state. *See Walden v. Fiore*, 571 U.S. 277, 284-85 (2014). Plaintiff cannot establish personal jurisdiction over TripLog or Advance under either New York's long-arm statute, NY CPLR §302(a), or the Due Process Clause of the Fourteenth Amendment, let alone both.

Thus, Plaintiff relies on consent. But Plaintiff's "consent" argument must fail. As an initial matter, the entire agreement is void (*see infra* at pp.21-22) and thus the forum selection provision is unenforceable against any Defendant. Even if the agreement were enforceable, however, neither Advance nor TripLog are parties to the subject agreement and did not consent to the forum selection clause. Knowing this, Plaintiff throws every possible theory at the wall to see if something sticks. In a series of legal conclusions, Plaintiff alleges that Advance and TripLog are "third-party beneficiaries of the referenced agreement, assignees of the agreement, closely related to Bizlog, and/or assumed the agreement. TripLog and Advance are equally bound by the forum selection clause." (SAC, ¶11.) Plaintiff's potpourri of third-party theories is meritless.

"[A] third-party beneficiary theory of contract enforcement grants a third party a right to ***enforce*** the contract; it does not grant a cause of action ***against*** the third party." *Trodale Holdings LLC v. Bristol Healthcare Inv'rs, L.P.*, 2017 U.S. Dist. LEXIS 196150, at *21 (S.D.N.Y. Nov. 29, 2017) (emphasis added). Next, the SAC is utterly devoid of any facts supporting an assignment of rights or assumption of obligations by BizLog to the other defendants. So really, what Plaintiff appears to be invoking is the "closely related" doctrine, which some courts have used to bind non-signatories to a forum selection clause in a contract where each non-signatory has a "sufficiently close relationship with the signatory *and* the dispute to which the forum selection clause applies." *Array Biopharma, Inc. v. Astrazeneca PLC*, 2019 NY Slip Op 32345(U), ¶ 6 (Sup. Ct., New York Cty. 2019). "A non-party is 'closely related' to a dispute if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct." *Id*.

"The inquiry is fact-specific, and bare allegations of control are insufficient." *Id*. Even if the non-signatory is "the signatory entity's 100% owner and its Board specifically approved the transaction," application of the doctrine is improper if the non-signatory "did not sign the agreement and had no involvement in the transaction." *Id*., at ¶7. And some courts have limited application of the doctrine to instances where the non-signatory is the successor-in-interest of the signatory. *Trane Int'l Inc. v. Calendatdores de Am., S.A. de C.V.*, No. 21cv4497 (DLC), 2022 U.S. Dist. LEXIS 87035, at *5 (S.D.N.Y. May 13, 2022).

As an initial matter, the "closely related" doctrine raises due process concerns in that it allows a court to exercise personal jurisdiction over a defendant without a showing of minimum contacts or compliance with the Due Process Clause of the Fourteenth Amendment. At least one New York appellate court has excused this short-cut because "[a] 'closely related' analysis requires that the relation of the parties be such as to make application of the clause foreseeable, rendering a separate minimum-contacts analysis unnecessary." *Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd.*, 184 A.D.3d 116, 121 (1st Dept. 2020). Defendants respectfully disagree with the side-stepping and contend that the traditional Constitutional analysis is required by Supreme Court precedent, especially where the "closely related" analysis is premised on the ***signatory's*** contacts with the forum state, not the ***non-signatory's***. *See Villalobos v. Telemundo Network Grp., LLC*, 2024 U.S. Dist. LEXIS 222473, at *12 (S.D.N.Y. Dec. 6, 2024) (casting doubt on the Constitutionality of the "closely related" test). Guilt by association is not a sound jurisdictional principle. But even if the Court adopts the doctrine, it would not apply here.

The same New York appellate court citing to *Array Biopharma, Inc. v. Astrazeneca PLC*, recognized that "[i]t was not reasonably foreseeable that [a] future affiliate—formed eight years after the contract had been executed—would be bound by the forum selection clause." *Highland*, 184 A.D.3d at 123. The "closely related" doctrine thus could not be applied in such a circumstance. The same is true here. Neither TripLog nor Advance even existed at the time the BizLog-Seatig contract was negotiated, formed, and largely performed on. (*See* He Decl., ¶7.) They thus did not have any role, active or passive, in BizLog (f.k.a. eSocial LLC) or the transaction at issue in the

contract. Indeed, they weren't even formed until half-a-decade later. (*See id.*) This alone is dispositive. Additionally, the Defendants are independent entities and the co-defendants were under no obligation under the BizLog-Seatig contract.[4] (*Id.*, ¶¶16-19.)

Finally, even if the Court finds that Plaintiff has made out a *prima facie* case for jurisdiction – it has not – it should at most only permit jurisdictional discovery, rather than concluding that TripLog and Advance are subject to personal jurisdiction under the "closely related" test.

## III.     THE SAC FAILS TO STATE A CAUSE OF ACTION

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Additionally, "legal conclusions couched as factual allegations" are not taken as true. *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020). Further, "[w]hen allegations contained within the complaint are contradicted by documents attached to the complaint [or incorporated by reference], the documents control, and the Court need not accept the allegations contained within the complaint as true." *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002); *see also Kamholtz v. Yates Cty.*, 350 F. App'x 589, 592 (2d Cir. 2009) (Documents plaintiffs possessed or knew about and upon which they relied in bringing suit may be considered without converting the motion to dismiss into one for summary judgment).

### (A) **Plaintiff's Breach Claims Fail in Whole or in Part**

Plaintiff's breach of contract and breach of implied covenant claims are premised entirely on the non-solicitation provision in its 2015 agreement with BizLog. (SAC, ¶¶1, 58, 69-91.) The claims therefore face two primary, independent issues. First, neither TripLog nor Advance were

---

[4] To the extent Plaintiff alleges Advance and TripLog breached a different "implied in fact" contract (DE 29, ¶¶87-90), the "closely related" doctrine cannot apply where the non-signatory would be bound to a *different* contract than one with the forum selection clause. *See Miller v. Mercuria Energy Trading, Inc.*, 774 F. App'x 714, 715 (2d Cir. 2019).

parties to the contract and are not bound to the non-solicitation provision. Second, more fundamentally, the non-solicitation provision is void and unenforceable as against public policy under New York law. Defendants address the latter point first as it is dispositive for all Defendants.

### 1. The Non-Solicitation Provision is an Anti-Competitive Restraint That is Unenforceable under New York Law

"Historically, New York courts refused to enforce restrictive covenants on the ground that they constituted restraints on trade." See Mathias v. Jacobs, 167 F. Supp. 2d 606, 610 (S.D.N.Y. 2001). Narrow exceptions have been judicially created in recent decades but New York courts still "adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with 'the general public policy favoring robust and uninhibited competition,' and 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.'" *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 386 (2d Cir. 1982).

Restrictive covenants have been enforced, subject to strict conditions, in two discrete scenarios: (1) "where there is a sale of [a] business courts will enforce an incidental covenant by the seller not to compete with the buyer after the sale" and (2) where restrictive covenants are "incorporated in employment contracts." *Crye Precision LLC v. Bennettsville Printing*, 755 F. App'x 34, 36 (2d Cir. 2018). District courts have recently recognized a third scenario, for restrictive covenants in "ordinary commercial contracts." *Id*. Ordinary commercial contracts have consisted of agreements like license, royalty, stock-options, and non-disclosure agreements. *See, e.g.*, *Supply Chain Prods., LLC v. NCR Corp.*, No. 19-CV-11376 (ALC)(JLC), 2023 U.S. Dist. LEXIS 55683, 2023 WL 2712503 (S.D.N.Y. Mar. 30, 2023); *Navajo Air, LLC v. Crye Precision, LLC*, 318 F. Supp. 3d 640, 651 (S.D.N.Y. 2018); *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 612-13 (S.D.N.Y. 2001). Courts scrutinize restrictive covenants in employment contracts under the most exacting standards, while giving the most deference to contracting parties in the sale-of-business context. *See id*.

The first step in any review of a restrictive covenant is to determine whether the enforcing party has a legitimate interest in enforcing the provision, and if so to identify it. *See Am. Inst. of*

*Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982). To be enforceable, a restrictive covenant must serve to protect against "unfair and illegal" conduct, not merely to insulate the employer from competition. *Id*. "[I]nterests that may justify specific enforcement of a restrictive covenant are limited to: (1) protection of trade secrets; (2) protection of confidential customer information; (3) protection of an employer's client base; and (4) protection against irreparable harm where an employee's services are unique or extraordinary." *Mkts. Grp. Inc. v. Pablo Oliveira*, 2020 U.S. Dist. LEXIS 20709, 2020 WL 820654, at *30 (S.D.N.Y. Feb. 3, 2020). If no interest exists, the inquiry is over and the covenant is unenforceable. *Am. Inst. of Chem. Eng'rs*, 682 F.2d at 387. If an interest does exist and has been identified, the next step depends on the nature of the underlying contract.

Restrictive covenants in employment contracts are "strictly construed." *Crye Precision LLC*, 755 F. App'x at 36. Such provisions are only enforceable to the extent they are "reasonable in time and area, necessary to protect the employer's *legitimate interests*, not harmful to the general public and not unreasonably burdensome to the employee." *Id*. "A restraint is 'reasonable' only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id*.

This test is slightly modified if the restrictive covenant appears in an "ordinary commercial contract." Such provisions are analyzed "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract." *Supply Chain Prods., LLC*, 2023 U.S. Dist. LEXIS 55683, 2023 WL 2712503, at *27. But even in this context, the Court must analyze the "totality of the circumstances to consider whether the clause (1) protects a legitimate business interest; (2) is reasonable in regard to geographic scope and temporal duration; and (3) the degree of hardship imposed upon the party against whom the covenant is enforced." *Id*.

Here, Seatig's 2015 contract with BizLog is in the nature of an employment contract. Although it attempts to hide the ball, Plaintiff's SAC still concedes – and the contract itself makes absolutely clear – that the purpose of the subject contract is to extend the labor of Seatig's Chinese employees to BizLog for low rates. (*See* SAC, ¶¶60, 84; He Decl., Ex. A at ¶¶1-8; He Decl., ¶¶4,

13-14, 19; *see also* ECF 11, ¶¶10, 15-16, 22.) Indeed, the workers were farmed out for as low as $8 per hour (He Decl., ¶15) and BizLog was exempt from payment if an employee was terminated or unavailable (He Decl., ¶5). The contract's provisions clearly setting forth a labor-for-hire arrangement directly contradict the SAC's "technology development" theory, which must be rejected. *Karmilowicz v. Hartford Fin. Servs. Grp.*, 494 F. App'x 153, 156 (2d Cir. 2012). Additionally, the non-solicitation provision affects the employees' ability to work as much as it affects BizLog's ability to hire. Even the mechanics of the hiring and firing operates like an employment contract because qualified workers are presented to BizLog for interview and selection. (He Decl., Ex. A, ¶5.) If BizLog believes an employee is insufficient, a replacement is presented for consideration. (*Id*.) Contrast that with the typical subject matter of an "ordinary commercial contract:" licensing of intellectual property, royalty payments, and stock-options. Such contracts provide for the exchange or use of goods, not labor. The Seatig-BizLog contract is much more akin to an employment contract. *Cf. Steelite Intl. U.S.A., Inc. v McManus*, 2021 US Dist LEXIS 80528, 2021 U.S.P.Q.2D (BNA) 472, at *15 [SDNY Apr. 27, 2021, No. 21-cv-2645 (LAK)] (finding a separation agreement more similar to a settlement agreement than a typical employment agreement). Accordingly, the more stringent test applicable to employment contracts should govern. Even if this Court disagrees, however, the non-solicitation provision is unenforceable even under the most lenient standard.

### i.    Seatig Has No Legitimate Interest

The underlying contract here concerned the provision of laborers for a software development project. (*See* He Decl., Ex. A at ¶¶1-5.) There were no confidential or other "customers" at issue and the subject laborer's services were not "unique or extraordinary" (*see id*., ¶5 [discussing replaceability of workers]; He Decl., ¶¶4, 13-14). Thus, the only other category Seatig could claim as a legitimate interest is the "protection of trade secrets," which Seatig has abandoned in the SAC. (*Compare* ECF 11, ¶¶24, 40-43 *and* SAC, ¶¶69-91.) Moreover, BizLog's contract with Seatig makes clear that the only proprietary information and intellectual property

involved in the parties' relationship belonged to BizLog, and it was ***Seatig*** that promised to keep said information in confidence. (*See* He Decl., Ex. A at ¶¶6, 10, 12 and Ex. B.) It is these provisions that concern protection of confidential information[5], not the non-solicitation provision.

To be sure, in the context of ordinary commercial contracts – which does not apply here – some courts have recognized preventing "unfair competition or protecting plaintiffs' rights in its trademarks or goodwill" as legitimate interests. *See McManus*, 2021 US Dist LEXIS 80528, 2021 U.S.P.Q.2D (BNA) 472, at *16. Here, the SAC does not allege the existence of any trademarks or misuse thereof. And there is no concern for unfair competition. Unfair competition has been defined as "the misappropriation of someone else's commercial advantage or of the property rights belonging to another." *Navajo Air, LLC*, 318 F Supp 3d at 650. Here, Seatig does not own anything protected by the non-solicitation provision. Seatig's employees are independent human beings that could leave Seatig's employ at will, and the FAC does not allege otherwise. Moreover, the parties do not compete; Seatig is a staffing agency of sorts and BizLog develops mileage tracking software. (*See* SAC, ¶¶12-20.)

Accordingly, the SAC does not state and Seatig cannot establish any legitimate interest. The inquiry can end here. As the Second Circuit held in *American Institute of Chemical Engineers v. Reber Friel Company*:

> The restrictive covenant has no legal justification. Its effect is merely to remove from possible competition one whose knowledge and skill, acquired before he came into its employ, has been found valuable to it, and to prevent that same knowledge and skill being utilized for the benefit of himself and others, after he has ceased to be employed by plaintiff. Such a covenant is an unreasonable restraint of trade and competition, and will not be enforced in a court of equity.

682 F.2d at 390. The non-solicitation provision is unenforceable and Plaintiff's breach of contract claim should therefore be dismissed.

---

[5] Importantly, confidential information and trade secrets are not co-extensive. The SAC does not allege the existence of or an interest in protecting trade secrets.

      *ii.   The Substantive Scope of the Provision is Disconnected to any Possible Interest*

Even if this Court disagrees, and finds some legitimate interest of Seatig, Seatig faces another, independent hurdle: there is no nexus between the legitimate interest and the extremely broad non-solicitation provision. In other words, it is not designed to "protect" the legitimate interest. Recall, the non-solicitation provision here prohibits BizLog and numerous non-signatories to the contract, including BizLog's subsidiaries and "affiliated entities," from working, in any capacity anywhere in the world concerning any subject matter, with any worker who was at any time in the past 13 years assigned to a project for BizLog by Seatig, Seatig's subsidiaries, or "affiliated entities" for **20 years** **after** the project ends! (SAC, ¶26.) Any worker that ever touched a BizLog project is off-limits to BizLog for over two decades (a sizeable chunk of a person's work-life), even if Seatig has terminated its relationship with BizLog and has no financial interest in the matter. Indeed, BizLog's CEO can't even hire a former Seatig worker as a tour guide in China, for two decades! The vast scope of the subject provision over-reaches whatever Plaintiff's legitimate interest could be.

For example, let's assume, *arguendo*, that Plaintiff's legitimate interest is to protect trade secrets. Plaintiff cannot explain how the non-solicitation provision protects those trade secrets. What trade secret would be divulged to BizLog 19 years after a project ends that wouldn't be divulged while the employee is working on the project? Additionally, the non-solicitation provision by its terms does not concern trade secrets or disclosure. In fact, there are numerous other provisions in the subject contract that concern confidential information, and any needed protections for trade secrets would be stated therein. (*See* He Decl., Ex. A at ¶¶6, 10, 12.)

This latter point was directly addressed in *Supply Chain Products, LLC v. NCR Corp.*, where Judge Carter of this Court held that the "non-compete clause over-reaches regarding the Plaintiff's protection of a legitimate business interest" because "although Plaintiff may have a legitimate business interest in protecting proprietary information, this is accomplished by other provisions in the Agreement." No. 19-CV-11376 (ALC)(JLC), 2023 U.S. Dist. LEXIS 55683, 2023 WL 2712503, at *29. For each legitimate interest claimed by the plaintiff, the court required

the plaintiff to "articulate how exactly the non-compete clause mitigates against [an alleged] risk" of harm. *Id*. at *30. Like the plaintiff in *Supply Chain*, Plaintiff Seatig cannot fulfill such a requirement. *See also Mathias*, 167 F. Supp. 2d at 613 (finding unenforceable a sweeping no contact clause that "was not necessary to protect [the plaintiff's] business interests.")

       *iii.*   *The Provision is Wildly Unreasonable in Geographic and Temporal Scope*

The non-solicitation provision is also unreasonable in both geographic and temporal scope. In terms of geographic scope, the provision is unlimited and would burden BizLog regardless of where it may wish to operate. Thus, BizLog would be prohibited from working with a covered developer, even in countries where Seatig is unlicensed and unable to legally offer staffing services or manage that employee (*e.g.*, Germany, Switzerland, Belgium, Canada, Ireland, and Norway). (*See* AGENCIES OF SLAVERY: THE EXPLOITATION OF MIGRANT WORKERS BY RECRUITMENT AGENCIES, 13 Tex. Wesleyan L. Rev. 377, 394; *see also* TAMING THE EMPLOYMENT SHARKS: THE CASE FOR REGULATING PROFIT-DRIVEN LABOR MARKET INTERMEDIARIES IN HIGH MOBILITY LABOR MARKETS, 13 Empl. Rts. & Employ. Pol'y J. 285, 308; Pollack Decl., ¶10.) Lack of geographic scope in a restrictive covenant is generally fatal. *See, e.g.*, *ABH Nature's Prods., Inc. v. Supplement Mfg. Partner, Inc.*, No. 19-CV-5637 (LDH) (JRC), 2024 U.S. Dist. LEXIS 58233, 2024 WL 1345188, at *17 (E.D.N.Y. Mar. 29, 2024); *Supply Chain*, No. 19-CV-11376 (ALC)(JLC), 2023 U.S. Dist. LEXIS 55683, 2023 WL 2712503, at *30; *Steelite*, No. 21-cv-2645 (LAK), 2021 US Dist LEXIS 80528, 2021 U.S.P.Q.2D (BNA) 472, at *19; *Mkts. Grp.*, No. 18-Cv-2089(GHW)(RWL), 2020 U.S. Dist. LEXIS 20709, 2020 WL 820654, at *32 [listing cases]).

    Similarly, the two-decade temporal scope far exceeds what is reasonable. That the clock only starts "after they have worked on projects for [BizLog]," extending the already lengthy 20-year-period indefinitely, exacerbates the matter for Plaintiff. (SAC, ¶26.) "Such a restraint on trade goes far beyond that which New York courts have deemed to be reasonable." *Crye Precision LLC*, 755 F. App'x at 37. For example, New York courts have struck down as unreasonable a much more reasonable provision that restricted a former franchisee from competing within 300 miles for

five years. *See id.* (*citing Maxon v. Franklin Traffic Serv., Inc.*, 261 A.D.2d 830 (4th Dept. 1999)). **<u>A restrictive covenant spanning two decades (and potentially longer) is virtually unheard of</u>**. Even in cases where the restrictive covenant is struck down, the provisions are effective during the term of the agreement or only for up to two years post-termination. *See id*. Especially considering the broad scope of the non-solicitation provision, the unlimited geographic application, its purported effect on non-signatories, and the lack of a legitimate interest, 20+ years is patently unreasonable. *See JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 106 n.14 (2d Cir. 2024) (collecting cases ruling that "ten-year restrictive covenants are consistently held unenforceable," "holding five-year noncompete unreasonable in duration," and "collecting cases striking three- and five-year restrictive covenants."); *Heartland Sec. Corp. v. Gerstenblatt*, 99 Civ. 3694 (WHP), 99 Civ. 3858 (WHP), 2000 U.S. Dist. LEXIS 3496, 2000 WL 303274, at *21 (S.D.N.Y. Mar. 22, 2000) (listing cases and striking down as unreasonable a non-compete provision that ran 2 years from time of termination and 4 years from start of employment, "especially when read with the limitless geographic scope of the covenant.")

### iv.    The Provision Imposes an Undue Burden upon its Targets

In addition to the infirmities discussed above, the subject non-solicitation provision is unenforceable because it imposes an astronomical burden on its targets, including BizLog and a host of unnamed, unidentified non-signatories. The non-solicitation provision goes far beyond what is necessary to protect against unfair or illegal conduct, and instead imposes a restraint on trade for the simple goal of preventing two parties from working together. To that end, the provision prohibits a whole host of conduct where no justification could possibly exist.

For example, the restrictive covenant prohibits BizLog from working with any former Seatig employee even if Seatig left the staffing business 19.5 years prior to the hiring! Whether through bankruptcy, voluntary dissolution, or because the sole officer wants to become a full-time ski instructor in the Swiss Alps, whatever the reason for Seatig's non-existence, the covenant is still in effect to block two independent, adult consenting parties from working together in any

capacity. This is true even though in that scenario Seatig would have no management capacity, financial ability, or even financial incentive to service either BizLog or the former Seatig employee. Hiring would be banned for the sake of banning.

Similarly, although the restrictive covenant is titled as a "non-solicitation" provision, it is not in any way limited to solicitation. A non-solicitation provision generally prohibits one party from soliciting another's clients, customers, or employees. But the subject provision goes leaps and bounds farther. It prevents BizLog from working with an employee that voluntarily, after independently leaving Seatig, approaches BizLog for work (up to 20 years after the employee left Seatig's employ). Courts have held that such overbroad "non-solicitation" provisions are unreasonable and unenforceable. In *Leon M. Reimer & Co., P.C. v. Cipolla*, for example, the Court ruled that a restrictive covenant that penalized the defendant for working with a client "who voluntarily and without any prior solicitation by [the defendant] contacts him and seeks to retain him" was unreasonable because it "prohibit[ed] considerably more than the active solicitation or diversion of clients" and "overprotects [the plaintiff's] interests and unreasonably limits [the defendant's] and [the defendant's former] clients' ability to choose professional services." 929 F. Supp. 154, 158 (S.D.N.Y. 1996).

As a third example, the restrictive covenant broadly encompasses all of Seatig's "employees, consultants, workers, or freelancers" who were staffed on BizLog projects no matter their involvement or length of time working with BizLog. Thus, a Seatig consultant who was incidentally staffed on a BizLog project for even 60 seconds and had no interaction with or engaged in any meaningful activity for BizLog would be off-limits. The provision is in fact so broad that it would restrict Seatig laborers who were selected to work on a BizLog project, did some menial preparatory work before BizLog agreed to hire that worker, and quit before ever even speaking to BizLog. (*See* He Decl., Ex. A at ¶1 [defining Seatig Employee broadly to encompass anyone hired by Seatig Inc. "based on specific system development requirements from Client," whether or not the individual is approved by BizLog].) In other words, BizLog could violate the broad non-solicitation provision by working with someone it never even met or spoke to before.

As mentioned above, Seatig's role in the relationship is limited. It finds suitable workers and handles payments to them in China. (*See* He Decl., Ex. A at ¶2.) In stark contrast, BizLog is responsible for every aspect of the employee's substantive work, including training, assignments, project management policies, conference calls, "frequencies for synchronizations," setting design & coding standards, and creating "policies regarding the usage of project management tools." (*Id*., ¶3.) All know-how, intellectual property, and work product belong to BizLog. (*Id*., ¶¶6, 10, 12.) BizLog thus builds the relationships with the workers and provides them with experience. And yet it is BizLog that is completely hampered by the restrictive covenant. There is nothing Seatig does that justifies the imposition of such unreasonable constraints on BizLog. The non-solicitation provision is designed to penalize and restrain, rather than protect legitimate interests. It is unreasonable and unduly burdensome, which renders it unenforceable under New York law. *See Crye Precision LLC*, 755 F. App'x at 37; *Supply Chain Prods.*, No. 19-CV-11376 (ALC)(JLC), 2023 U.S. Dist. LEXIS 55683, 2023 WL 2712503, at *31; *Mathias*, 167 F. Supp. 2d at 612 [striking down restrictive covenant that was "sweeping in design and effect."].

## 2. Even if the Provision Was Enforceable, the Contract Cannot be Enforced Against TripLog and Advance

Even if the Court disagrees with the above analysis, Plaintiff's breach of contract claim must at least be dismissed in part. The SAC clearly alleges that only BizLog agreed to the subject non-solicitation provision. (SAC, ¶¶20, 22-23.) The SAC does not allege – because it cannot – that either TripLog or Advance were parties to the contract, signatories, express intended beneficiaries, or even knew about the contract. This is because TripLog and Advance didn't even exist in 2015, when the contract was allegedly formed! (*See* He Decl., ¶¶6-7.) Ted He hired Seatig workers on behalf of BizLog. The mere fact that TripLog and Advance allegedly incidentally benefit from BizLog's products, whether through marketing, resale, or in some other way, does not make them bound to all contracts with BizLog as a party. Otherwise, every user of a company's technology and every licensee would be roped into a company's obligations. Do we all have to pay Google's office rent since we use its search engine? Of course not.

19

Moreover, the contract's broad language that appears to include unidentified non-signatories cannot bind TripLog or Advance because, again, they did not exist at the time of the contract and therefore, BizLog could not have had authority to bind them with a single signature for BizLog. *See Horowitz v. Broads Mfg. Co.*, 54 Misc. 569, 571, 104 N.Y.S. 988, 990 (App. Term 1907) ("Broads had no authority [to bind the yet formed corporation], for there was nothing in existence from which he could derive authority").[6] Under Plaintiff's best-case scenario, it may argue that TripLog and Advance had oral contracts with Seatig but there is no such allegation in the SAC. And in any event, such oral agreements would not have contained a non-solicitation provision, let alone the non-solicitation provision Plaintiff claims was breached. Accordingly, at minimum, Plaintiff's breach of contract claim must be dismissed against TripLog and Advance.

The SAC takes a novel approach, different from the FAC, in alleging the existence of some "implied agreement" between Seatig and TripLog and Advance. (SAC, ¶87.) To do this, however, Plaintiff assigns to TripLog and Advance the very same conduct it already assigned to BizLog. (*See* SAC, ¶¶83-90.) It uses the same exact communications and course of performance that its breach of contract claim against BizLog is premised upon and simply subscribes the same to TripLog and Advance to form some implied in fact agreement. This tactic essentially creates an "alter ego on steroids" doctrine whereby BizLog, TripLog, and Advance are all the same entity and are all acting simultaneously in each communication that Seatig had with "Ted," and each is separately liable for different causes of action under different contracts – some express and some implied – based on the same conduct. There is no basis in law or fact for such a doctrine. Indeed, Plaintiff merely repleads its breach of contract claim as an implied covenant claim. This is improper. *See JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022) ("A claim for violation of the covenant [of good faith and fair dealing] survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and

---

[6] There are additional issues concerning authority and intent to be bound as it relates to the enormously broad language in the non-solicitation provision but the Court need not venture into that rabbit hole because no authority or intent could have possibly existed for non-existent entities.

the relief sought is not intrinsically tied to the damages that flow from the breach of contract");
*Trustpilot*, 2021 U.S. Dist. LEXIS 121150, at *25 ("If a breach of contract claim, based upon the same facts, is also pled, courts applying New York law do not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing.") (internal citations and quotation marks omitted). All claims against TripLog and Advance must be dismissed.

**3. The FAC Does Not Allege Causation**

Finally, if the above reasons are insufficient to dismiss Plaintiff's breach of contract claim – they should be sufficient – Plaintiff's claim also fails because it does not adequately allege the element of causation. The SAC alleges that BizLog terminated its contract with Seatig in August 2023. (SAC, ¶62.) And at some unknown time thereafter, Seatig's former employees left Seatig to work for BizLog. (*Id*., ¶80.) But the SAC does not allege that both BizLog and the Seatig employees would have continued to work with Seatig but for BizLog deciding to hire the employees directly (after the employees exited their employment with Seatig). Since Seatig would only be entitled to payment if both sides continued working with Seatig (*see* He Decl., Ex. A at ¶¶7, 9), such allegations are material to the issue of causation. To be sure, BizLog was under no obligation to continue working with Seatig employees beyond the time set in the statement of work for each worker (*id*., ¶9). If BizLog planned to stop working with Seatig, for any reason unrelated to the alleged breach, then Seatig can present no damages. Seatig must first plead and then ultimately prove that BizLog would have continued working with Seatig but for its alleged direct-hire arrangement with the terminated employees.

**(B) The SAC Fails to Establish Legality**

Finally, perhaps the Court need not venture into any of the above analyses, because Plaintiff is utilizing the courts to further its illegal conduct. Although the SAC alludes to Plaintiff Seatig's status as a staffing firm of sorts, it does not allege that it was lawfully operating. In New York, employment agencies and businesses that source talent for others must be licensed by the State. N.Y. GBL §172. Plaintiff Seatig is not so licensed. (Pollack Decl., ¶¶7-9.) The same is true

under Chinese law, which Seatig and Seatig Chengdu were violating. (*See* Jiamin Decl., ¶7.) Accordingly, it was illegal for Seatig to operate and perform under the parties' contract, which renders the contract *void ab initio*.[7] *See Sirota v. Champion Motor Grp., Inc.*, 18 Misc. 3d 862, 866, 849 N.Y.S.2d 426, 430 (Sup. Ct., Kings Cty. 2008). Seatig's inability to allege legality, dooms the SAC and all claims asserted.

## CONCLUSION

For any and all of the reasons stated herein, Defendants respectfully request that this Court dismiss Plaintiff's Second Amended Complaint (ECF 29) in its entirety and with prejudice.


Dated: March 10, 2025                    Respectfully Submitted,

                                         /s/ Steven Pollack
                                         Steven Pollack, Esq.
                                         POLLACK LAW, P.C.
                                         225 Broadway, Suite 850
                                         New York, NY 10007
                                         Telephone: (212) 765-5225
                                         Fax: (929) 529-8562
                                         Steve@stevepollacklaw.com

                                         *Counsel for Defendants*

---

[7] Notably, Seatig may also be violating New York and Chinese law by engaging in illegal labor trafficking and unlawful recruitment.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2025, I filed the foregoing via the Court's electronic case filing system, which automatically serves the foregoing on all counsel of record, including:

Andrew R. Goldenberg
Claudia Mumic
LEVY GOLDENBERG LLP
75 Broad Street, Suite 2120
New York, New York 10004
T: (212) 906-4499
E: andrew@levygoldenberg.com
E: claudia@levygoldenberg.com

*Counsel for Plaintiff Seatig Inc.*

I certify under penalty of perjury that the foregoing is true and correct.

Dated: March 10, 2025                    Respectfully submitted,

                                        **POLLACK LAW, P.C.**

                                        /s/ Steven Pollack
                                        Steven Pollack, Esq.
                                        POLLACK LAW, P.C.
                                        225 Broadway, Suite 850
                                        New York, NY 10007
                                        Telephone: (212) 765-5225
                                        Fax: (929) 529-8562
                                        Steve@stevepollacklaw.com

                                        *Counsel for Defendants*